# United States District Court
## for the Northern District of Oklahoma

---

Case No. 24-cv-43-JDR-CDL

---

Scott Meyer *and* Kelley Meyer,

*Plaintiffs*,

*versus*

Newrez LLC,

*Defendant*.

---

## OPINION AND ORDER

---

Plaintiffs Scott and Kelley Meyer got behind on their home loan payments. Mr. Meyer contacted Defendant Newrez LLC, their loan servicer, to discuss ways to become current and avoid foreclosure. Over a period spanning about a year, Mr. Meyer and Newrez representatives discussed by telephone and through written correspondence the possible ways for the Meyers to become current and avoid foreclosure. By the fall of 2023, the relationship had broken down, and Newrez proceeded with the foreclosure. The Meyers allege that Newrez's actions in the summer and fall of 2023 breached several contractual and legal obligations that Newrez owed them in connection with the servicing and management of their home loan, which was secured by a mortgage on their house. Dkt. 2 at 10-19. The Meyers allege (1) tortious breach of contract, (2) a violation of the Fair Debt Collection Practices Act, (3) a violation of the Oklahoma SAFE Act (Okla. Stat. tit. 59, § 2095 *et seq.*), (4) negligence and negligence per se, (5) false representation, (6) constructive fraud, and (7) actual fraud. *Id*. The Meyers voluntarily dismissed two of their

Case No. 24-cv-43

eight counts,[1] and Newrez now seeks summary judgment on the Meyers' six remaining claims. Dkts. 71, 72. Newrez's motion is granted in part and denied in part.

## I.

The pertinent facts, taken in the light most favorable to the Meyers with all inferences drawn in their favor,[2] are as follows: Mr. Meyer purchased property located at 400616 W. 4000 Road, Collinsville, Oklahoma, in January 2020. Dkt. 72 at 7 (statement of fact no. 1); Dkt. 93 at 6 (admitting statement of fact no. 1).[3] Two years later, he refinanced his loan and executed a note in which he agreed to repay $239,044 to the lender, Regent Financial Group, Inc. *Id.* at 8 (statement of fact no. 1). Although Mrs. Meyer did not sign the note, both she and Mr. Meyer executed a mortgage on their property to secure

---

[1] The Meyers' Amended Complaint sets forth eight claims against Newrez. Dkt. 26. Claims II (violation of the FDCPA) and III (violation of the Oklahoma SAFE Act) are no longer at issue. *See* Dkts. 61, 82, 90, 92.

[2] Newrez has raised several evidentiary objections to the facts presented by Plaintiffs and has asked the Court to strike portions of Plaintiffs' evidence. *See* Dkt. 100. The Court notes that Newrez's objections to hearsay, among others, do not necessarily preclude the Court from considering Plaintiffs' evidence at the summary judgment stage. *See Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (indicating that evidence that would be inadmissible at trial may be considered at the summary judgment stage if the evidence could ultimately be presented in admissible form). But the Court need not delve into the merits of Newrez's motion to strike, as the Court's opinion does not depend on the challenged evidence. The Court refers only to additional facts 19, 21, 22, 25, 26, 28, and 32. Of these, only additional facts 19, 25, 28, and 32 are challenged. Dkt. 101 at 11-12. With respect to additional statement of fact no. 25, the Court relies only on the fact that the payment was rejected; with respect to additional statement of fact no. 28, the Court relies only on the fact that the application was prepared by Mr. Meyer, not Mr. Orival; and with respect to additional statement of fact no. 32, the Court relies only on the fact that the Meyers did not submit payments in July or August. These facts are not disputed or challenged by Newrez. *See* Dkt. 100 at 6-10. The Court's ruling does not depend on additional statement of fact no. 19, which concerns an attempted payment allegedly made in February 2023. For these reasons, the Court denies Newrez's motion to strike as moot.

[3] All citations utilize CMECF pagination.

Case No. 24-cv-43

the note. *Id.* The mortgage included a VA Guaranteed Loan and Assumption Policy Rider. *Id.*

The initial payment on the note was due on March 1, 2022. Defendant Newrez began servicing the loan that same month. Dkt. 72 at 9 (statement of fact no. 5); Dkt. 93 at 7 (admitting statement of fact no. 5 in pertinent part).[4] Soon afterward, Mr. Meyer began having trouble making his regular monthly payments. Dkt. 72 at 9 (statement of fact no. 6); Dkt. 93 at 6 (admitting statement of fact no. 6 in pertinent part).[5] Mr. Meyer was offered the opportunity to participate in a repayment plan in September 2022. Dkt. 72 at 10 (statement of fact no. 7); Dkt. 93 at 8 (admitting statement of fact no. 7 in pertinent part). Under that plan, Mr. Meyer was required to make an initial payment of $1,573.58 on October 1, 2022, and twelve subsequent payments of $1,844.61 in the months that followed. Dkt. 72 at 10 (statement of fact no. 7).

Mr. Meyer was unable to make all the payments required under the plan.[6] Newrez initiated foreclosure proceedings on February 7, 2023. Dkt. 93 at 8 (response to undisputed fact no. 7). At that time, Mr. Meyer was several months behind on his payments. Dkt. 72 at 10 (statement of fact no. 10); Dkt. 93 at 8 (admitting statement of fact no. 10 in pertinent part). On March 7, 2023, Newrez granted Mr. Meyer a 90-day forbearance period, which placed the foreclosure proceedings on hold. Dkt. 72 at 11 (statement of fact no. 10);

---

[4] Newrez did not originate the loan but agreed to service it on behalf of the lender, Regent Financial Group. Dkt. 72 at 9 (statement of fact no. 5).

[5] Mr. Meyer missed his regular payments in May, June, and August of 2022; he made payments in July and September that were applied to the missed May and June payments. Dkt. 72 at 9, n.9 (statement of fact no. 6). The Meyers dispute this assertion in part to clarify that they paid more than the required regular monthly payment in July, September, October, and December of 2022, and that Newrez rejected an attempted payment in February 2023. Dkt. 93 at 8.

[6] Mr. Meyer made the October payment but did not make the November payment. Dkt. 72 at 10 (statement of fact no. 7). He made a payment in December 2022 and attempted to make a payment in February 2023. Dkt. 72 at 9, n.9 (statement of fact no. 6); Dkt. 93 at 8 (disputing in part statement of fact no. 6). Newrez refused to accept the February payment. Dkt. 93 at 10 (additional statement of fact no. 19).

Case No. 24-cv-43

Dkt. 93 at 11 (additional statement of fact no. 21). After the forbearance was granted, Mr. Meyer made a payment of $9,035.80 in May 2023, and a payment of $3,000 in June. Dkt. 72 at 11 (statement of fact no. 10); Dkt. 72-1 at 31; Dkt. 93 at 11 (additional statement of fact no. 21).

Mr. Meyer started a new, higher-paying job in July 2023, and called Newrez on July 18 to discuss his loan. Dkt. 93 at 11 (additional statement of fact no. 22). A Newrez representative took information from Mr. Meyer, indicating that the information would be used to pre-qualify the Meyers for a workout option. *Id.*[7] The representative informed Mr. Meyer that another Newrez representative and designated point of contact, Jimmy Orival, would evaluate the information and reach out in ten to fifteen days. *Id.*

On July 24, 2023, Mr. Meyer called Newrez and spoke with Mr. Orival. Dkt. 93 at 10.[8] During that call, Mr. Meyer expressed his intention to make a $1,500 payment toward his outstanding obligations. Dkt. 105-1 at 3-4. In response, Mr. Orival stated that, due to the status of the loan, Mr. Meyer was required to pay the outstanding balance in full. *Id.* at 4. Mr. Meyer objected that he had discussed a possible workout option just one week prior, and that he had been told that he could keep making payments toward his outstanding balance while Newrez worked on the repayment program. *Id.* at 5.

Mr. Orival then shifted gears and began discussing the workout options available to Mr. Meyer. Mr. Orival stated that Newrez had "some programs" that Mr. Meyer "may be a great contender for," and that if Mr. Meyer "want[ed] to take advantage of them, [he was] free to do so." *Id.* at 6. Mr. Orival explained that the programs would "start in September" and require monthly payments of $1,877.47 for 339 months, *id.*, and that Mr. Meyer could

---

[7] Newrez does not dispute this fact. *See* Dkt. 98 at 2.

[8] The Court has listened to a recording of the call between Mr. Meyer and Mr. Orival in its entirety.

Case No. 24-cv-43

forgo further payments—including the one he was attempting to make—until
the program began:

> SCOTT MEYER: So what you're saying is . . . if
> we did this, my payment would go up to $1,800
> starting in September?
>
> JIMMY ORIVAL: That is correct, sir, to keep
> you in your house. That is correct.
>
> SCOTT MEYER: Okay . . .. and that's the best
> one so far?
>
> JIMMY ORIVAL: That is what -- that is what's
> being offered to you right now, sir.
>
> ***
>
> JIMMY ORIVAL: And, yes, you'd be fine, just
> get to keep your house, that is correct, sir.
>
> SCOTT MEYER: Okay. . .. So you're giving me
> a little reprieve here. Sorry.
>
> JIMMY ORIVAL: No, you --
>
> SCOTT MEYER: You have to understand the
> stress I've been under.
>
> JIMMY ORIVAL: Right, right. But . . . but, sir,
> you -- you get to keep your house, so everything
> will be --
>
> SCOTT MEYER: Uh-huh.
>
> JIMMY ORIVAL: -- everything will be fine.
>
> SCOTT MEYER: Uh-huh.
>
> JIMMY ORIVAL: And we're going to start the
> loan all over for you again and so nothing -- noth-
> ing -- so you -- so you don't have to move or any-
> thing like that.
>
> SCOTT MEYER: Okay.

Case No. 24-cv-43

JIMMY ORIVAL: And all that stress is out the window because you have a new -- because you -- because you fixed the problem.

SCOTT MEYER: Okay . . . So everything is going to be good, I don't have, I don't have to pay any more . . . all I've got to do is start doing $1,800 a month come September 1st?

JIMMY ORIVAL: That -- that is correct, sir. And then you get -- you get August off, so August you can get everything --

SCOTT MEYER: Oh, God --

JIMMY ORIVAL: -- get everything together and --

SCOTT MEYER: -- that's great.

JIMMY ORIVAL: -- just whatever -- whatever other bills you have to pay and you could just call the --

SCOTT MEYER: Thank you.

JIMMY ORIVAL: -- the creditor and take care of that in --

SCOTT MEYER: Uh-huh.

JIMMY ORIVAL: -- September. Just start over here.

SCOTT MEYER: Okay. So you . . . will send me information on all that stuff?

JIMMY ORIVAL: I will -- yes, I will submit that for you right now if you --

SCOTT MEYER: Okay.

JIMMY ORIVAL: -- if that's what you want, sir, and then September -- we start fresh in September. There's no problem.

*See* Dkt. 105-1 at 8-11.

Case No. 24-cv-43

Mr. Meyer then sought to confirm that he was "in free, everything's good," and he would start making payments of $1,800 on September 1st. *Id.* at 12. After clarifying the amount that would be due under the plan, Mr. Orival indicated he would submit the plan for approval and send the paperwork to Mr. Meyer to sign. *Id.* He stated that Mr. Meyer would "just have to sign it . . . and then send it back to us and then . . . everything [would] be fine" with "nothing to worry about." *Id.* When Mr. Meyer sought to confirm that he did not need to make a payment that day, Mr. Orival said he could "write that down," that everything was "noted." *Id.* at 13. Before hanging up, Mr. Meyer indicated he would be looking to make his first payment in September, and Mr. Orival responded, "[a]ll right. You'll get the paperwork and then everything will be itemized for you." *Id.* at 14.

There is no evidence that Mr. Orival ever submitted the promised application, nor is there any evidence that Mr. Orival sent Mr. Meyer a completed, itemized application for Mr. Meyer's signature following the July call.[9]

As a result of Mr. Orival's representations, the Meyers did not submit any additional payments in July or August of 2023. Dkt. 93 at 14 (additional statement of fact no. 32). Instead, Mr. Meyer attempted to make a payment of $1,880 in September 2023 under what he believed to be the new plan. Newrez rejected the payment. Dkt. 93 at 12 (additional statement of fact no. 25). Although Mr. Meyer was initially told that the payment may have been rejected because it was made online, rather than over the phone, that statement was not correct; the payment was refused because Mr. Meyer had not,

---

[9] Mr. Meyer did submit a mortgage assistance application in September 2023, but the application was prepared by Mr. Meyer, not Mr. Orival. Dkt. 72-1 at 6; Dkt. 93 at 13 (additional statement of fact no. 28). Further, that application required more than just a simple signature from Mr. Meyer. Mr. Meyer was required to submit an application listing his income, expenses, and assets, a written explanation of the circumstances his hardship, and supporting documentation such as bank statements, tax forms, income documentation, and pay stubs. Dkt. 72-1 at 6, 72.

Case No. 24-cv-43

in fact, received approval for the plan discussed by Mr. Orival, and Newrez had elected to proceed with the foreclosure action. *Id.*; Dkt. 93-2 at 53-54.

On September 25, 2023, Mr. Meyer called Newrez to discuss the matter. He learned that Mr. Orival had not obtained approval for the loan modification and had failed to communicate the requirements for the loan application with Mr. Meyer. Dkt. 93 at 12 (additional statement of fact no. 26). Newrez sent Mr. Meyer a mortgage assistance application, which Mr. Meyer completed and returned the following day. Dkt. 93 at 13 (additional statement of fact no. 28)[10] Newrez acknowledged receipt of the application, but informed Mr. Meyer that the application was incomplete, as it lacked a signed, dated, hardship affidavit. Dkt. 72-1 at 6, 55. Mr. Meyer was granted until October 29 to provide the signed affidavit. *Id.* Mr. Meyer failed to meet that deadline. He submitted his signed affidavit in November 2023, and Newrez filed a motion for default judgment in the foreclosure action five days later. Dkt. 72 at 11 (statement of fact no. 11); Dkt. 72-1 at 6-7, 55, 61-64; Dkt. 93-12.

Mr. Meyer initiated this lawsuit in January 2024. Dkt. 2 at 10. On July 26, 2024, Newrez voluntarily reinstated the delinquent loan, paying $31,842.61 to bring it current. Dkt. 72-1 at 7. To date, the property has not been foreclosed upon, and the Meyers have retained possession of the property. *Id.*

## II.

Summary judgment is proper only if, when the facts are construed and all reasonable inferences are drawn in favor of the non-moving party, the documents and evidence of record establish that there is no genuine issue of fact that would permit a jury to find in favor of the non-moving party, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P.

---

[10] Newrez acknowledges that the application was submitted but disagrees with Mr. Meyer's assertion that it was complete, as the application did not include a handwritten signature. Dkt. 72-1 at 6.

Case No. 24-cv-43

56(c); *see also Mincin v. Vail Holdings, Inc.*, 308 F.3d 1105, 1108 (10th Cir. 2002).

### III.

Newrez argues it is entitled to summary judgment on the Meyers' claim for tortious breach of contract because (1) there is no evidence that Newrez breached any contractual duties it owed to the Meyers, and (2) Oklahoma law does not permit recovery on a tortious breach of contract claim outside of the insurance context. *See* Dkt. 72 at 16-19. The Court disagrees on both points.

To establish a right to relief for tortious breach of contract, a plaintiff must show, at the outset, the primary elements of a traditional breach-of-contract claim, including breach of the contract. *See Mousavi v. John Christner Trucking, LLC*, 487 F. Supp. 3d 1194, 1206 (N.D. Okla. 2020).[11] Newrez argues it did not breach any of the express duties owed under the agreements in this case. *See* Dkt. 72 at 17. The Meyers respond that, although Newrez may not have breached its express contractual obligations, it nevertheless breached its common-law duty to carry out its obligations under the applicable contracts "with care, skill, reasonable expediency, and faithfulness." Dkt. 93 at 19 (quoting *Lewis v. Farmers Ins. Co.*, 1983 OK 100, ¶ 5, 681 P.2d 67). The Meyers submit that Newrez breached this duty when, among other things, it falsely informed Mr. Meyer that he was not required to make any payments in July or August of 2023 and then proceeded with a foreclosure action when he failed to make those payments. *Id.* at 17-19.[12]

Oklahoma courts have long recognized that "[e]very contract in Oklahoma contains an implied duty of good faith and fair dealing." *Wathor v.*

---

[11] Newrez does not address the first and third elements—the existence of a contract and damages—in its brief.

[12] *See also* Dkt. 93 at 6 (arguing that the "VA evidence certainly adds to the egregious mishandling of the Meyers' mortgage loan" and may impact a damages analysis).

Case No. 24-cv-43

*Mutual Assur Adm'rs, Inc.*, 2004 OK 2, ¶ 5, 87 P.3d 559, 561 (citing *Doyle v. Kelly*, 1990 OK 119, 80 P.2d 717, 718). This duty prohibits parties to a contract from acting in a way that would "injure the parties' reasonable expectations [or] impair the rights or interests of the other to receive the benefits flowing from their contractual relationship." *First Nat'l Bank & Trust Co. of Vinita v. Kissee*, 1993 OK 96, ¶ 24, 859 P.2d 502. As a result, a party to a contract is prohibited from taking unfair advantage of the other party to the contract. *Embry v. Innovative Aftermarket Sys., L.P.*, 2010 OK 82, ¶ 14, 247 P.3d 1158, 1161.

A breach of this implied duty can be established even in circumstances where there has been no breach of any express provisions of a contract. For example, in *Grubb v. DXP Enterprises, Inc.*, 85 F.4th 959 (10th Cir. 2023), the Tenth Circuit found that the plaintiff could pursue a breach of contract claim against the defendant who had failed to create a new company in accordance with the parties' intentions; although the parties' contract did not expressly require the defendant to create a new company, the Court of Appeals held that the case should proceed to trial because there was evidence that supported the conclusion that the defendant failed to create a new company in bad faith. *Id.* at 963-70 (indicating a party may be in breach of a contract if it acts in bad faith to prevent the occurrence of a condition necessary for a benefit to the other party). Likewise, in *Kissee*, the Oklahoma Supreme Court indicated that conduct such as misrepresentation and deceit could support a claim for breach of contract, without pointing to any contractual provisions prohibiting such conduct. 1993 OK 96, ¶¶ 23-29, 859 P.2d 502, 509-510.[13] Based on this law, the Court concludes that breach of contract can be

---

[13] This statement is dicta, as the court ultimately held that the evidence of misrepresentation and deceit was lacking. *See Kissee*, 1993 OK 96, ¶¶ 23-29, 859 P.2d at 509-510. The dicta is, nevertheless, pertinent to this Court's analysis because the Court's task is to predict how the Oklahoma Supreme Court would resolve the issue presented here. *E.g., Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1281-82 (10th Cir. 2013) (predicting how the Oklahoma Supreme Court would rule in the absence of controlling case law).

Case No. 24-cv-43

established by evidence that Newrez engaged in conduct that injured Plaintiffs' reasonable expectations, impaired their interest in receiving benefits of the contracts, or took unfair advantage of them.

The Court is mindful of the fact that the pertinent question at the summary judgment stage is not whether Newrez ***actually did*** act in a way that injured the Meyers' "reasonable expectations," impaired their interest in receiving the rights and benefits of their contracts, or took "unfair advantage" of the Meyers;[14] instead, the question is whether ***a jury could find*** that Newrez did those things. *Grubb*, 85 F. 4th at 968-69. The Court answers the latter, broader question in the affirmative. A jury could find that Mr. Meyers may have "reasonably expected" that Newrez would not move forward with the foreclosure action when, according Newrez's representative, it was processing a workout option on his behalf. Dkt. 93 at 11; Dkt. 105-1 at 8-11. A jury could further conclude that Newrez injured those expectations and took unfair advantage of the Meyers by telling Mr. Meyer that he was not required to make payments for July and August of 2023; rejecting his September payment; and moving forward with the foreclosure in September after he had called Newrez to make a payment. Dkt. 93 at 12; Dkt. 93-2 at 53-54; Dkt. 105-1 at 8-11.

The Oklahoma Supreme Court has indicated that misrepresentation and deceit can give rise to a claim for breach of the implied duty of good faith and fair dealing. *See Kissee*, 1993 OK 96, ¶ 24, 859 P.2d 502, 509. And while a jury might find that Newrez was merely reckless when it made false statements to Mr. Meyer, a jury could also find that this conduct was deliberate, in bad faith, or an attempt to take unfair advantage of the Meyers. The question of which is correct is for a jury to decide.

Newrez argues that, even if it breached its contractual obligations to Plaintiffs, it nevertheless cannot be held liable for ***tortious*** breach of contract

---

[14] *Kissee*, 1993 OK 96, ¶ 24, 859 P.2d 509; *Embry*, 2010 OK 82, ¶ 14, 247 P.3d at 1161.

Case No. 24-cv-43

because it did not have the type of relationship with Plaintiffs that would give rise to a tort claim. Ordinarily, a breach of the implied duty of good faith and fair dealing will give rise only to a breach-of-contract claim, not a tort claim. *Id. See Combs v. Shelter Mut. Ins. Co.*, 551 F.3d 991, 999 (10th Cir. 2008) (recognizing that, in the absence of a special relationship, any claim for breach of the implied duty of good faith and fair dealing is contractual in nature). There are certain exceptions to this general rule: First, as Newrez correctly notes, a claim for tortious breach of contract may be pursued when the contract creates a special relationship between the parties, such as the relationship between an insurer and its insured. *See Kissee*, 1993 OK 96, ¶ 25, 859 P.2d at 509 (indicating that the special relationships between insurers and their insureds differentiates insurance contracts from ordinary commercial contracts). But this is not the only instance where a breach of contractual obligations may give rise to an action in tort; the Oklahoma Supreme Court has also recognized that an action for tortious breach of the implied duty of good faith and fair dealing may lie where a party acts with gross recklessness and wanton negligence. *McGregor v. Nat'l Steak Processors, Inc.*, No. 11-cv-0570-CVE-TLW, 2012 WL 314059, at *5 (N.D. Okla. Feb. 1, 2012) (quoting *Rodgers v. Tecumseh Bank*, 1988 OK 36, ¶ 16, 756 P.2d 1223, 1227).

Newrez suggests that evidence of gross recklessness or wanton negligence is an "additional requirement" of establishing a tortious breach of contract claim where a special relationship exists, rather than an alternative grounds for supporting a tortious breach of contract claim. Dkt. 101 at 4. But this position is inconsistent with both Oklahoma law and this Court's jurisprudence. The Supreme Court recognized in *Rodgers* that gross recklessness and wanton negligence, standing alone, could give rise to a tortious breach of contract claim. *Rodgers*, 1988 OK 36, ¶ 16, 756 P.2d at 1227; *McGregor*, 2012 WL 314059, at *5. And in *Beshara v. Southern National Bank*, the Oklahoma Supreme Court concluded that the trial court should have permitted a plaintiff to move forward with a tortious breach-of-contract claim based on the plaintiff's allegation that the defendant bank had acted intentionally,

12

Case No. 24-cv-43

maliciously, and with reckless and wanton disregard for his rights. *Beshara*, 1996 OK 90, ¶ 28, 928 P.2d 280, 288 (finding that "Beshara should have been allowed the opportunity to proceed on his allegations for tortious breach of the duty of good faith and fair dealing" and that the "trial court erred in refusing to allow Beshara to proceed on this alternative theory of recovery").

Newrez invites this Court to hold that *Beshara* does not expressly waive the special relationship requirement. Dkt. 101 at 5. Although *Beshara* does not discuss the requirement, it is an example of a case where a claim for tortious breach of contract brought by a customer against a financial institution was permitted to proceed, despite the lack of any special relationship between the customer and the bank. *Beshara*, 1996 OK 90, ¶ 28, 928 P.2d at 288. This case is closer to *Beshara* than any other case cited by the parties. And as it is this Court's job to predict how the Oklahoma Supreme Court would resolve this case, *see Schrock*, 727 F.3d at 1281-82, the Court cannot dismiss that case as an aberration, an outlier, or incomplete statement of the law as Newrez would have this Court do. The Supreme Court's opinion in *Beshara* precludes this Court from holding that a special relationship is required to support a claim of tortious breach of contract; so long as there is evidence of gross recklessness or wanton negligence by a party to the contract, a claim for tortious breach of contract may proceed. Because the evidence in this case, including Mr. Orival's false statements regarding Mr. Meyer's need to make payments in July and August of 2023, could permit a jury to find that Newrez acted with gross recklessness and wanton negligence, Newrez's motion to dismiss the Meyers' tortious breach of contract claim is denied.

IV.

Newrez next argues that the Meyers' negligence claim fails as a matter of law, because Newrez did not owe the Meyers any obligations independent of any contract. *See* Dkt. 72 at 20-21. The Meyers respond that an action for negligence may arise from the same set of facts as a breach-of-contract claim

Case No. 24-cv-43

in appropriate circumstances. *See* Dkt. 93 at 18-19.[15] But the Meyers fail to establish that the circumstances of this case would permit them to recover on a general negligence claim. The Oklahoma Supreme Court has held that there "is simply no general duty to use reasonable care in the performance of a contract," and that Newrez's duty "to act reasonably and diligently in the performance of a contract" is "encompassed within the implied covenant of fair dealing and good faith." *Embry*, 2010 OK 82, ¶ 14, 247 P.3d at 1161.[16]

Here, Plaintiffs challenge Newrez's failure to act with skill, expediency, care, and faithfulness. *See* Dkt. 83 at 18-19. This is precisely the type of conduct at issue in *Embry*, which the court found was "simply proof of [the defendants'] breach of the implied duty to deal fairly and in good faith, and not an independent theory of recovery." *Embry*, 2010 OK 82, ¶ 14, 247 P.3d at 1158, 1161 (holding that the trial court did not err in "eliminating this theory of recovery on summary judgment" where the allegations pertained to the defendants' neglect and lack of diligence). *See Bd. of Cnty. Commissioners of Harmon Cnty. v. Ass'n of Cnty. Commissioners of Oklahoma Self-Insured Grp.*, 2022 OK CIV APP 36, ¶ 8, 521 P.3d 142, 149. The Meyers have not provided any factual or legal basis to permit this Court to conclude that its negligence claim is in any way distinguishable from its claim for tortious breach of contract. Accordingly, in view of the court's pronouncement in *Embry*, Newrez's motion for summary judgment on the Meyers' negligence

---

[15] Newrez seeks summary judgment on both Plaintiffs' general negligence claims and their claims for negligence per se. Dkt. 72 at 20-22. The Meyers did not respond to Newrez's arguments regarding their negligence per se claim. *See* Dkt. 93 at 18-20. Because they failed to point to any facts that would support a negligence per se claim, summary judgment is proper with respect to that claim. *See* Fed. R. Civ. P. 56(e).

[16] The Oklahoma cases cited by the Meyers predate *Embry*; to the extent those cases are in conflict, the Court follows the Oklahoma Supreme Court's more recent pronouncement. *See Finnell v. Seismic*, 2003 OK 35, ¶ 13, 67 P.3d 339; *Lewis v. Farmers Ins. Co.*, 1983 OK 100, 681 P.2d 67; *Oklahoma Natural Gas v. Pack*, 1939 OK 475, ¶ 14, 97 P.2d 768, 770; *Woods Petr. Corp. v. Delhi Gas Pipeline Corp.*, 1983 OK CIV APP 26, ¶ 16, 700 P.2d 1023, 1027.

Case No. 24-cv-43

claim must be granted. *See T.D. Williamson, Inc. v. Lincoln Elec. Automation, Inc.*, No. 21-CV-153-GKF-JFJ, 2022 WL 16842907, at *4 (N.D. Okla. Jan. 21, 2022) (dismissing negligence claim that was "essentially identical" to the plaintiff's breach of contract claim).

V.

The Meyers allege that Newrez is liable for false representation and actual fraud, and Newrez contends it is entitled to summary judgment on both counts. *See* Dkt. 26 at ¶¶ 48-54, 59-63; Dkt. 72 at 22-24. First, Newrez argues that Oklahoma law does not recognize a cause of action for misrepresentation, and that this theory of recovery is duplicative of Plaintiffs' fraud claims. Dkt. 72 at 22. Plaintiffs acknowledge that the claims overlap but maintain that common law fraud is broader than a statutory fraudulent misrepresentation claim. Dkt. 93 at 22. Plaintiffs' position is correct. Oklahoma courts have long recognized common-law fraud claims. *E.g., Bowman v. Presley*, 2009 OK 48, ¶ 13, 212 P.3d 1210, 1217-18 (setting forth the elements of actionable fraud under the common law). And as the court acknowledged in *Bowman*, the common law "remains in force unless a legislative enactment expressly states otherwise . . . ." *Id.* Newrez has not pointed to a legislative enactment stating that the common law has been displaced by the statutory causes of action for actual and constructive fraud, both of which were in place well before the court recognized the viability of a common-law fraud claim in *Bowman. Compare id.* (reversing summary judgment on the plaintiff's fraud claims based on the elements of common-law fraud), *with Manhattan Constr. Co. v. Degussa Corp.*, No. CIV-06-611-M, 2007 WL 9711225, at *2 (W.D. Okla. Nov. 2, 2007) (discussing statutory causes of action for fraud and deceit under Okla. Stat. tit. 15, § 58 and Okla. Stat. tit. 76, §§ 2, 3). Absent such a clear statutory indication that claims for common-law fraud are no longer viable, the Court rejects Newrez's argument that Plaintiffs' common-law fraud claim is categorically banned.

Case No. 24-cv-43

Newrez next argues that, regardless of how Plaintiffs' fraud claims are categorized, the claims cannot proceed because (1) there is no evidence that Newrez or its employees made a false statement with the intent to deceive Plaintiffs, and (2) there is no evidence that Plaintiffs relied on any false statements by Newrez. *See* Dkts. 72 at 23-24; 101 at 8-9.[17] The Court disagrees. A jury could conclude that Mr. Orival knowingly made false statements when he told Mr. Meyer that he could forgo his July and August payments. Dkt. 105-1 at 8-11.[18] And a jury could find that the Meyers relied on those statements when they delayed making further payments, resulting in the acceleration of the foreclosure action.

Finally, Newrez argues that there is no evidence of intent to deceive on the part of Mr. Orival. Assuming direct evidence of intent to deceive is required at this stage,[19] it is present here: In addition to the evidence already recited by the Court, Newrez has admitted that Mr. Orival had a pattern of making dishonest statements to Mr. Meyer for his own benefit. Dkt. 93-2 at

---

[17] A claim for common-law fraud requires proof of a false statement, made knowingly or recklessly without knowledge of the truth with the intent that it be acted upon by the other party, which the other party relies upon to his or her detriment. *See Bowman*, 2009 OK 48, ¶ 13, 212 P.3d at 1218 (setting forth elements of common law fraud). Statutory actual fraud, in contrast, requires intent to deceive. *See* Okla. Stat. tit. 15, § 58. *See also* Okla. Stat. tit. 76, § 2 (requiring willful deception with intent to induce another to alter his position to his detriment).

[18] Newrez contends that the larger context of the call clarified that Mr. Orival's statements were preliminary in nature and subject to approval. *See* Dkt. 101 at 2. The Court has reviewed the entirety of the call between Mr. Orival and Mr. Meyer and concludes that, while a jury **might** reach the conclusion proposed by Newrez, a jury need not necessarily do so. Because the transcript of the call could support the conclusion that Mr. Orival made false representations, summary judgment is improper.

[19] Oklahoma cases suggest that a party's intent is a question of fact for determination by the jury. *See Sutton v. David Stanley Chevrolet, Inc.*, 2020 OK 87, ¶ 10, 475 P.3d 847, 852, as corrected (Oct. 21, 2020) (indicating that actual fraud "is always a question of fact and must be proved at law"); *Morris v. McLendon*, 1933 OK 619, ¶ 10, 27 P.2d 811, 812 (stating that, because "the issue of fraud is generally an issue of fact, it is only where there is an entire absence of proof of fraud that the court is justified in taking the case from the jury and directing a verdict").

Case No. 24-cv-43

41 (referencing "another dishonest statement by Mr. Orival, which, again, makes it appear he's looking out for himself"). The evidence of record is sufficient to send to the jury the question of whether the Meyers have established the elements of both common-law and actual fraud. Accordingly, Newrez's motion for summary judgment is denied with respect to both of Plaintiffs' fraud claims.

## VI.

Newrez contends that the Meyers' claims for constructive fraud fails because there is no special relationship that would permit recovery under a theory of constructive fraud. *See* Dkt. 72 at 24-25. The Court disagrees. Constructive fraud is the breach of a legal or equitable duty to provide truthful information (regardless of whether there is an intent to deceive), which applies so long as there is "an underlying right to be correctly informed of the facts." *Faulkenberry v. Kansas City S. Ry. Co.*, 1979 OK 142, ¶ 4, 602 P.2d 203, 206 n.2.[20]

Although the right to be correctly informed *may* arise out of a special or fiduciary relationship, that is not the only context in which a right to be informed may arise. As noted in *Roberts Ranch Co. v. Exxon Corp.*, claims for constructive fraud have been permitted not only in the context of fiduciary relationships but also in cases where a party "undertakes to speak and conveys only partial information to the other party" or where one "convey[s] a false impression by the disclosure of some facts and the concealment of others." *Roberts Ranch Co. v. Exxon Corp.*, 43 F. Supp. 2d 1252, 1259 n. 12 (W.D. Okla. 1997). A jury could find, based on the transcript of the call between Mr. Meyer and Mr. Orival, that Newrez created a false impression by conveying only partial information to Mr. Meyer. This is sufficient to permit Plaintiffs'

---

[20] *See also Sutton v. David Stanley Chevrolet, Inc.*, 2020 OK 87, ¶ 11, 475 P.3d 847, 853, as corrected (Oct. 21, 2020).

constructive fraud claims to proceed. Newrez's motion for summary judgment on that claim is, therefore, denied.

## VII.

Finally, Newrez argues that there are no facts that would permit Plaintiffs to recover for a violation of the implementing regulations of the Real Estate Settlement Procedures Act of 1974, 12 C.F.R. 1024.41. That provision, commonly referred to as Regulation X, prohibits loan servicers from engaging in "dual tracking" by initiating foreclosure proceedings while a complete or facially complete loan-modification application is pending. See 12 C.F.R. § 1024.41(f); *Hurst v. Caliber Home Loans, Inc.*, 44 F.4th 418, 422 (6th Cir. 2022).

The question of whether an application is "complete" appears to rest within the discretion of the lender. *See Sharma v. Rushmore Loan Mgmt. Servs., LLC*, 611 F. Supp. 3d 63, 83 (D. Md. 2020) (noting that "the definition of 'complete' . . . appears to leave significant discretion to the servicer to determine what paperwork is needed in an application"). Regulation X provides that a "complete loss mitigation application" is an application that provides the servicer with "all the information that ***the servicer*** requires from a borrower." 12 C.F.R. § 1024.41(b)(1). A servicer who receives a loss mitigation application from a borrower has an obligation to (1) determine whether the application is complete, and (2) notify the borrower in writing within a prescribed time period whether the application is complete or incomplete and, if the application is incomplete, state the additional materials that the borrower must provide to complete the application and the deadline for doing so. *Id.* at § 1024.41(b)(2)(i)(B).

There is no dispute that Newrez deemed the Meyers' September 2023 application incomplete due to Mr. Meyers' failure to provide a handwritten signature with his affidavit. There is no dispute that Newrez timely provided Mr. Meyer with notice that his application was incomplete, and that he would be required to submit a handwritten signature by October 29, 2023. And there

Case No. 24-cv-43

is no dispute that Mr. Meyer failed to meet the stated deadline. In view of these undisputed facts, the Court agrees with Newrez that Mr. Meyer was no longer protected by the dual-tracking prohibition once he failed to meet the supplementation deadline of October 29, 2023. *E.g., Hurst*, 44 F. 4th at 425 (affirming summary judgment where the plaintiff "did not submit required additional information to Caliber by the articulated deadline," as the plaintiff was protected from foreclosure "only until the deadline expired").

Mr. Meyer suggests that (1) his application was complete in September, because he digitally signed his affidavit, and (2) even if a "wet" signature was required, Newrez had his handwritten signature—and therefore had a complete application—in November 2023, five days before Newrez proceeded with the foreclosure. These arguments are unavailing. Regulation X provides loan servicers with discretion to determine whether an application is complete, and the Meyers have pointed to no case law suggesting that a Court may second-guess the necessity of those requirements in the context of a dual-tracking claim. *See Sharma*, 611 F. Supp. 3d at 83. Further, the language of Regulation X does not suggest that the protections against dual tracking are reinstated if a borrower completes his application after the deadline imposed by the servicer, and the Meyers have pointed to no case law suggesting that reinstatement of those protections is required under the circumstances presented here. This Court holds, based on the language of Regulation X and in accordance with the Sixth Circuit's holding in *Hurst*, that a borrower is protected from foreclosure only until the deadline for completing his or her application expires. *Hurst*, 44 F. 4th at 425. Because the Meyers "did not submit required additional information to [Newrez] by the articulated deadline," they were no longer protected by the prohibition against dual

Case No. 24-cv-43

tracking as of October 29, 2023. *Id.* Accordingly, Newrez is entitled to summary judgment on Plaintiffs' dual-tracking claim.[21]

### VIII.

For the reasons set forth above, the court grants Newrez's motion for summary judgment with respect to Plaintiffs' negligence claim and their claim for violation of Regulation X. The court denies Newrez's motion with respect to all other claims.

DATED this 17th day of January 2025.

John D. Russell
*United States District Judge*

---

[21] In view of the Court's resolution of this question, the Court declines to address whether Mrs. Meyer, as a named borrower, has a legal right to pursue a claim for a violation of Regulation X.